UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CONSORTIUM OF SERVICES INNOVATION A/K/A/ CSI,<br><br>              Plaintiff,<br>   v.<br><br>MICROSOFT CORPORATION,<br><br>             Defendant. | CASE NO. C19-0750-JCC<br><br>ORDER |

This matter comes before the Court on Defendant's motion to dismiss (Dkt. No. 21) Plaintiff's amended complaint (Dkt. No. 20). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

I.     **BACKGROUND**

The following factual allegations are taken from Plaintiff's first amended complaint and the many exhibits attached thereto.[1] Plaintiff is a foreign corporation chartered and

---

[1] When considering a motion to dismiss, the Court may consider documents attached to the complaint without converting the motion into one for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The Court is "not required to accept as true conclusory allegation which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998).

headquartered in Riyadh, Saudi Arabia. (*Id*. at 2.) Plaintiff is a privately-owned, diversified company; it is not an educational institution or government agency. (*Id*. at 3.) In 2013, Plaintiff sought to provide training services for Microsoft Office Specialist ("MOS") and Microsoft Technology Associate ("MTA") certificates in Saudi Arabia. (*Id*.) The MOS and MTA certificates consist of a limited license to use the programs and a testing service and certification examination process. (*See* Dkt. Nos. 20-3 at 3, 20-6 at 6–8.)

In February 2013, Microsoft Arabia Co., Ltd., a wholly-owned subsidiary of Defendant, named Plaintiff its exclusive authorized partner in Saudi Arabia. (*See* Dkt. No. 20 at 3.) Microsoft Arabia sent the Technical and Vocational Training Corporation ("TVTC") of Saudi Arabia a letter that stated Plaintiff was "the only authorized partner of Microsoft Arabia Co. Ltd. in Kingdom of Saudi Arabia in . . . Management, Marketing, organization and operation of . . . [MOS and MTA]" for a five-year period beginning on January 1, 2013. (*See* Dkt. No. 20-1 at 2–3.) In March 2013, Certiport, a business of NCS Pearson, Inc. that owns the MOS delivery and testing service, sent a letter to TVTC stating that Plaintiff had been named as the provider of MOS and MTA exams for Saudi Arabia. (Dkt. Nos. 20 at 3, 20-2 at 4.)

On June 22, 2013, Plaintiff met with Samir Noman, the President of Microsoft Arabia, Ayman Al-Takrori, and Ahmad Issa. (*See* Dkt. Nos. 20 at 5; 20-6 at 6, 8–9.) The parties agreed that TVTC governed all professional certifications in Saudi Arabia, that Plaintiff was the "Exclusive Microsoft Academy Service Partner," and that Plaintiff was asked to place "a minimum order of 1,000 Volume Licenses." (Dkt. No. 20 at 5; *see* Dkt. No. 20-6.) On June 24, Plaintiff sent an application and agreement of sale on credit to ALFalak Electronic Equipment and Supplies Company. (Dkt. Nos. 20 at 4, 20-4 at 1.) On the same day, Plaintiff submitted an order to Al Falak for 1,000 MOS CertSitePack volume licenses, with payment due by the end of April 2014 and with "Delivery within One Week." (Dkt. Nos. 20 at 4, 20-5 at 2.)[2] Defendant was

---

[2] Plaintiff asserts that it was the purchaser, Al Falak was the distributor and servicer of Defendant's software, and Defendant was the supplier. (*See* Dkt. No. 20 at 4.) Plaintiff further asserts that it communicated directly with Defendant and Defendant's "local representatives"

not involved in the discussions between Plaintiff and Al Falak, (*see* Dkt. No. 20-23 at 6), and Plaintiff ultimately purchased the licenses from Al Falak, (*see* Dkt. Nos. 20-4, 20-5, 20-12).

On June 25, 2013, Microsoft Ireland Operations Limited sent an email to TVTC and Plaintiff regarding the order for 1,000 volume licenses. (*See* Dkt. No. 20-7.) The details of the confirmation listed TVTC as the customer and Plaintiff as a channel partner. (*Id*. at 7.) Plaintiff subsequently sent an email to Issa stating that "the deal should be done with the eLearning Dept not with the IT," and Issa responded that the change would be made. (*Id*. at 6.)

Plaintiff asserts that the confirmation used "fake or invalid email addresses to manipulate the ordering process and defraud" Plaintiff and listed TVTC as the customer to circumvent Defendant's internal policy of selling volume licenses only to governments or academic institutions. (*See* Dkt. No. 20 at 6.) Plaintiff further asserts that it was told that the volume licenses would be sent to Plaintiff "according to the agreement with Microsoft appointed [sic] distributor, Al Falak." (*Id*.)

On December 24, 2013, Microsoft Arabia signed a cooperation agreement with TVTC, which stated that Microsoft Arabia "represents Global Microsoft in" Saudi Arabia. (Dkt. No. 20-8 at 2.) Microsoft Arabia and TVTC agreed that TVTC would authorize Plaintiff to handle matters pertaining to the MOS certification process. (*Id*. at 3.) Plaintiff asserts that the cooperation agreement precluded it from delivering or selling MOS exams in Saudi Arabia during the six months following its purchase of the volume licenses. (*See* Dkt. No. 20 at 6–7.)

On the same day, TVTC and Plaintiff entered into an operation and marketing agreement which stated that Plaintiff was in charge of "physical, organizational, and operational obligations resulting from execution of this agreement . . . as required for executing the" cooperation agreement between Microsoft Arabia and TVTC. (Dkt. No. 20-9 at 3.) The operation and

---

about the purchase, and that one of Defendant's local representatives assured Plaintiff by email "that the material and exams . . . was available now for 5 of the 9 core curriculum and would be ready by October 2013 at the latest for the balance of the curriculum." (*Id*. at 4–5.)

marketing agreement set forth TVTC's obligation to manage certificate training centers and Plaintiff's obligations to provide TVTC with certificate tests, up-to-date software, and other marketing and logistical support. (*See id*. at 3–5.)

In February 2014, Plaintiff presented TVTC with "free MOS vouchers" Plaintiff obtained through Certiport. (Dkt. No. 20 at 7.) The vouchers were used for examinations held during an education exhibition, and many applicants failed. (*See* Dkt. No. 20-10 at 3.) TVTC was dissatisfied by the low pass rate, noted that the certification program's launch had been significantly delayed due to "the non-availability of the product," and identified several other issues with Plaintiff's handling of the launch. (Dkt. No. 20-10 at 3–4.) TVTC requested that Plaintiff conduct trainings on a newer version of Microsoft Office, provide additional instructional content, secure effective training tests, and provide TVTC with launch and marketing plans within 10 business days. (*See id*. at 4.)

On March 2, 2014, Al Falak asked Plaintiff to confirm its outstanding balance. (*See* Dkt. Nos. 20 at 8, 20-11 at 10.) Plaintiff disputed the balance because it had been told that the certification tests were not ready. (*See* Dkt. No. 20-11 at 8–9.) In September 2014, Plaintiff conditionally confirmed its outstanding balance with Al Falak, stating that it was subject to receiving its order "with a validity date not less than 12 months from the date of receiving . . . ." (Dkt. Nos. 20 at 8, 20-12 at 1.)

In December 2014, Microsoft Deutschland GmbH held a call with Plaintiff and Certiport. (*See* Dkt. Nos. 20 at 8–9, 20-13.) The parties agreed that "the relaunch of the Arabic exams" would occur on December 18, 2014, that the "CIC exam" would be launched mid-February, that Plaintiff was in the process of "localizing the practice tests," and that "[n]o stakeholder feels there are pending risks to our deployment / launch date." (*See* Dkt. No. 20-13 at 3–4.) The email was the "official sign-off on the remaining items prior to the launch with TVTC." (*Id*. at 3.)

In February 2015, Certiport emailed Plaintiff "to confirm that [Plaintiff] is ensured access to the VL portal 1000 MOS site licenses that includes 500,000 MOS exams available for use for

TVTC . . . . [T]hese site licenses were available in the portal since the *26th of June 2013*." (Dkt. Nos. 20 at 9, 20-14 at 5.) Certiport attached a description of the order which listed TVTC as the customer and an order date of June 26, 2013. (*See* Dkt. No. 20-14 at 5.) Plaintiff asserts that the order date is inaccurate and that it had not been told that the volume licenses were available prior to Certiport's email. (*See* Dkt. No. 20 at 9–10.)

During March 2015, Plaintiff and Al Falak communicated with Microsoft Arabia about confirming the validity of the volume licenses for "12 months after the date the codes are received and acknowledged by [Plaintiff] from Microsoft." (*See* Dkt. Nos. 20 at 10; 20-15 at 4–5; *see also* Dkt. Nos. 20-16—20-18.) Microsoft Arabia stated that the MOS volume licenses could be extended to the end of December 2015, subject to a renewal order of 500 licenses before the end of June 2015. (Dkt. No. 20-15 at 4.) On March 11, 2015, Plaintiff disputed that it had received access codes for the volume licenses and requested a "standard validity period" instead of an extension. (Dkt. Nos. 20 at 10, 20-16 at 2.) Plaintiff received an order and access codes during March 2015. (*See* Dkt. Nos. 22 at 9, 11; 20-28 at 5.)

In April 2015, Plaintiff agreed to pay Al Falak $250,000 over 18 months. (Dkt. Nos. 20 at 12, 20-21 at 3.) In May 2015, following substantial negotiations between Plaintiff and Saima Adney, a Senior Regional Director EMEA with Microsoft Learning Experiences, (*see* Dkt. Nos. 20 at 12 – 13, 20-23—20-24), an agreement was reached. (*See* Dkt. Nos. 20 at 13–14, 20-25–20-30.) Under the new agreement, Plaintiff's volume licenses would expire on June 30, 2015; Plaintiff would place an order for 500 new volume licenses in May 2015; following the May 2015 order, Certiport would provide Plaintiff with additional exams for licenses set to expire on June 30, 2016; Certiport would provide Plaintiff with 250 volume licenses set to expire on June 30, 2016; and on January 1, 2016, Certiport would provide Plaintiff with 250 volume licenses set to expire on December 31, 2016. (*See* Dkt. Nos. 20 at 14, 20-30 at 2, 20-31.) In a confirmation email sent on May 14, 2015, Plaintiff's Vice President of Business Development listed TVTC as the customer and "Moustafa Kadous mkadous@thinkcsi.com" as the contact person. (*See* Dkt.

No. 20-31 at 4.) On May 15, 2015, Plaintiff submitted an order for 500 volume licenses to Al Falak. (*See* Dkt. Nos. 20 at 15, 20-32–20-34.)

On May 2016, TVTC sent Microsoft Arabia a letter stating that TVTC was considering whether to retain Plaintiff as its sole provider of MOS certification and requesting that Microsoft Arabia provide information about licenses it distributed "during the six months precedent to the license . . . ." (Dkt. Nos. 20 at 15–16, 20-36 at 1–2.) On October 20, 2016, after not receiving a response, TVTC sent a letter to Microsoft Arabia directing it to not conduct relevant business in Saudi Arabia without obtaining licenses from TVTC. (*See* Dkt. Nos. 20 at 16, 20-37 at 2.) On July 2, 2017, TVTC and Plaintiff agreed to terminate their operation and marketing agreement. (*See* Dkt. Nos. 20 at 16–17, 20-38 at 1–2.) Plaintiff alleges that TVTC advised it that Microsoft Arabia had been conducting direct MOS business in Saudi Arabia in violation of TVTC and Plaintiff's operation and marketing agreement. (*See* Dkt. Nos. 20 at 16–17.)

On January 12, 2018, Certiport told Plaintiff that "Microsoft Volume Licensing exams are only for educational institutions or governmental organizations," not private companies, and that the prior volume license orders had been "for TVTC and [were] delivered . . . to the customer as requested by Microsoft." (Dkt. No. 29-30 at 3; *see* Dkt. No. 20 at 17.) Plaintiff asserts that the email demonstrates that Defendant was never able to deliver volume licenses yet forced Plaintiff to pay for several orders it never received. (*See* Dkt. No. 20 at 17.)

In February 2018, TVTC told Plaintiff that it had not received the volume licenses or "entered into any agreement with any vendor promoting professional certification." (Dkt. No. 20-40 at 3; *see* Dkt. No. 20-41.) Plaintiff asserts that TVTC sought "a formal reply and clarification from Microsoft and Certiport," (Dkt. No. 20-40 at 3), and upon receiving none, froze Plaintiff's certification activities in Saudi Arabia. (Dkt. No. 20 at 18.) On February 27, 2019, Certiport provided Plaintiff with the email addresses and phone numbers associated with

1  the volume license orders. (*See* Dkt. Nos. 20 at 18–19, 20-42 at 3–4, 20-43 at 3.)[3] Plaintiff

2  asserts that the email addresses and phone numbers are "fake" or unknown to Plaintiff. (*See* Dkt.

3  No. 20 at 18–19.)

4      Plaintiff filed its initial complaint on May 17, 2019, and its amended complaint on

5  August 30, 2019, bringing claims for fraud, breach of contract, and violation of the Washington

6  Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86 *et seq*. (*See* Dkt. Nos. 1, 20.)

7  Defendant moves to dismiss Plaintiff's amended complaint. (Dkt. No. 21.)

## II.  DISCUSSION

### A.  Motion to Dismiss Legal Standard

A defendant may move for dismissal when a plaintiff "fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 678. Although the court must accept as true a complaint's well-pleaded facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion. *Vasquez v. L.A. Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001). The plaintiff is obligated to provide grounds for their entitlement to relief that amount to more than labels and conclusions or a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Dismissal under Rule 12(b)(6) "can

---

[3] Certiport stated that the June 26, 2013 volume license order confirmation email was sent to sami@tvtc.gov.sa and that the May 20, 2015 volume license order and December 31, 2015 volume license order confirmation emails were sent to makous@thinkcsi.com. (*See* Dkt. Nos. 20 at 18–19, 20-42 at 3–4.)

## B. Defendant as Proper Party

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). A "rare exception" to this principle is the doctrine of piercing the corporate veil, which may be "applied in the case of fraud or certain other exceptional circumstances . . . and [is] usually determined on a case-by-case basis." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). To determine whether the corporate entity should be disregarded, courts look to three factors: "the amount of respect given to the separate identity of the corporation by its shareholders, the fraudulent intent of the incorporators, and the degree of injustice visited on the litigants by recognition of the corporate entity." *Laborers Clean-Up Contract Admin. Tr. Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516, 524 (9th Cir. 1984) (citing *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979)).

Defendant moves to dismiss Plaintiff's complaint for failure to name the proper defendant, as Plaintiff's allegations concern actions taken by Defendant's subsidiaries which are not attributable to Defendant and Plaintiff has not alleged facts sufficient to justify piercing the corporate veil. (*See* Dkt. No. 21 at 11–12.) In response, Plaintiff does not direct the Court to allegations in the complaint establishing Defendant's direct involvement in the actions underlying Plaintiff's claims. (*See* Dkt. No. 24 at 2, 7–9.)[4] Instead, Plaintiff first "alleges that

---

[4] Plaintiff cites Exhibit 8 of the complaint for the proposition that Plaintiff "had an agreement to acquire volume licenses directly from [Defendant] . . . . The volume license agreement does not list any of [Defendant's] subsidiaries as parties to the agreement." (Dkt. No. 24 at 2.) Exhibit 8 of the complaint is the cooperation agreement between Microsoft Arabia and TVTC. (*See* Dkt. No. 20-8.) The "Microsoft School 3 Order Confirmation Notice," which includes the quote "…thank you for placing your order with Microsoft" cited by Plaintiff, was

1 [also] be based on the lack of a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

[Defendant] intentionally contracted with [Plaintiff] through [Defendant's] subsidiaries." (*Id*. at 8) (citing *Morgan v. Burks*, 611 P.2d 751, 755 (Wash. 1980)). Plaintiff's cursory argument, unsupported by citation to factual allegations set forth in the complaint, is insufficient to establish a plausible claim that Defendant intentionally used its subsidiaries to violate a duty it owed to Plaintiff or that the corporate veil should be pierced. *See Morgan*, 611 P.2d at 755; *Laborers Clean-Up*, 736 F.2d at 524.

Second, Plaintiff "contends that Microsoft Arabia and any other subsidiary involved in the contracting with [Plaintiff], was acting as [Defendant's] alter ego." (*See* Dkt. No. 24 at 8.) To support a claim of alter ego liability, Plaintiff must establish that (1) "there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate entities] would result in fraud or injustice." *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (quoting *American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996)); *see Calvert v. Huckins*, 875 F. Supp. 674, 678 (E.D. Cal. 1995) (stating the first prong as requiring a showing that the parent corporation controls its subsidiary "to such a degree as to render the latter the mere instrumentality of the former."). Plaintiff points to its allegations that Defendant, not its subsidiaries, created and owned the volume licenses at issue in this case and formulated the policy of selling volume licenses only to educational institutions and governmental entities. (*See* Dkt. No. 24 at 9.) These allegations do not show that Defendant exercised such control over its subsidiaries as to render them mere instrumentalities or that treating Defendant and its

---

sent to Plaintiff by Microsoft Ireland Operations Limited and is attached as Exhibit 7 of the complaint. (*See* Dkt. Nos. 20-7 at 7–9, 24 at 2.)

The Court notes that the facts section of Plaintiff's complaint also alleges that Defendant's subsidiaries "were acting as the apparent agents on behalf of defendant and defendant was aware of and controlled its subsidiaries [sic] actions. Defendant's subsidiaries held themselves out as agents of defendant . . . ." (Dkt. No. 24 at 2.) Because Plaintiff's claims appear in the fact section of its brief, (*see id*.), and Plaintiff does not support these claims with substantive argument, (*see generally id*.), the Court declines to address them.

subsidiaries as separate entities would result in fraud or injustice. *See Unocal*, 248 F.3d at 926; *Calvert*, 875 F. Supp. at 678. Absent these showings, Plaintiff has not established a plausible claim that Defendant may be held liable for its subsidiaries' actions under the alter ego theory of liability.

In sum, the factual allegations in Plaintiff's complaint do not establish a plausible claim that Defendant is liable for the alleged conduct underlying Plaintiff's claims in this action. *See Iqbal*, 556 U.S. at 678.[5] Therefore, Plaintiff has failed to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (Dkt. No. 21) is GRANTED. Plaintiff's first amended complaint (Dkt. No. 20) is DISMISSED. Plaintiff shall file an amended complaint curing the defects identified by the Court no later than 14 days from the date this order is issued. Failure to do so may result in dismissal of this action without prejudice.

DATED this 30th day of October 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

---

[5] As Plaintiff has failed to establish that Defendant is a proper party to this action, at this time the Court does not address whether Plaintiff's claims for fraud, breach of contract, and violation of the CPA are subject to dismissal under Rule 12(b)(6). (*See* Dkt. No. 20 at 19–23.)